| **FOX ROTHSCHILD LLP** | **McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP** | **CONNELL FOLEY LLP** |
|---|---|---|
| Francis V. Cook | | Kevin J. Coakley |
| Jonathan D. Ash | Ronald J. Riccio | Mitchell W. Taraschi |
| Corinne B. DeBerry | | |
| | | |
| 212 Carnegie Center | 1300 Mount Kemble Ave. | 56 Livingston Ave. |
| Suite 400 | P.O. Box 2075 | Roseland, NJ 07068 |
| Princeton, NJ 08540 | Morristown, NJ 7962-2075 | (973) 535-0500 |
| (609) 896-3600 | (973) 993-8100 | *Attorneys for Plaintiffs* |
| *Attorneys for Plaintiffs* | *Attorneys for Plaintiffs* | |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| GEORGE HARMS CONSTRUCTION CO., INC. and BRIAN BURNS, <br><br> Plaintiffs, <br><br> v. <br><br> GATEWAY DEVELOPMENT COMMISSION, DR. BALPREET GREWAL-VIRK, In Her Official Capacity, ALICIA GLEN, In Her Official Capacity, TONY COSCIA, In His Official Capacity, JAMEY BARBAS, In Her Official Capacity, AMY ROSEN, In Her Official Capacity, MARIE THERESE DOMINGUEZ, In Her Official Capacity, VICTOR J. HERLINSKY, JR., In His Official Capacity, THOMAS F. PRENDERGAST, In His Official | UNITED STATES DISTRICT COURT DISTRICT OF NEW JERSEY TRENTON VICINAGE <br><br> CIVIL NO. 3:25-cv-17679 <br><br><br> **COMPLAINT** <br><br> **Electronically filed** |

175876113.8

Capacity, FEDERAL TRANSIT
ADMINISTRATION, UNITED
STATES DEPARTMENT OF
TRANSPORTATION, JOHN
DOES 1-20, AND ABC
ENTITIES 1-10;

Defendants.

Plaintiffs George Harms Construction Co., Inc. ("Harms") and Brian Burns (collectively, the "Plaintiffs") by and through their counsel, Fox Rothschild LLP, submit this Complaint against Defendants Gateway Development Commission ("GDC"), Dr. Balpreet Grewal-Virk, Alicia Glen, Tony Coscia, Jamey Barbas, Therese Dominguez, Amy Rosen, Victor J. Herlinsky, Jr., Thomas F. Prendergast, the Federal Transit Administration ("FTA"), and the United States Department of Transportation ("USDOT") (collectively, the "Defendants"), and in support thereof, avers as follows:

## INTRODUCTION

The GDC has been entrusted with $16 billion of public funds, both state and federal, to rebuild and repair the commuter rail infrastructure between New Jersey and New York in what is known as the Hudson Tunnel Project ("HTP") – thought to be the most important public infrastructure project in the last century.

As part of the HTP, the GDC is currently bidding the New Jersey Surface Alignment Project (the "Project"). Harms is one of only four prequalified teams for

2

the Project. Despite this, the GDC is barring Harms from the Project by deliberately excluding the bargaining representative of Harms' workforce, the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO ("USW"), from a project labor agreement ("PLA") that was only added *after* Harms was prequalified and the Request for Proposals ("RFP") was released and was drafted by and negotiated exclusively with the Hudson County Building and Construction Trades Council, AFL-CIO, the ("Building Trades") to the detriment of all other qualified sources of labor.

GDC's exclusion is based solely upon unlawful political considerations. USW is an equally qualified union within the jurisdiction with the necessary skills for the Project. Harms repeatedly warned the GDC that its failure to include the USW in the PLA would preclude Harms from bidding – eliminating 25% of the competition for the Project. While publicly pretending to consider Harms' concerns, the GDC never contemplated adding the USW or allowing Harms to bid. The GDC instead repeatedly stated Harms can bid, ignoring all the reasons it cannot and failing to provide any legitimate basis for the exclusion of USW.

The GDC has arbitrarily established December 10 as the deadline for its four prequalified bidders to submit bids. Harms has filed a protest. The GDC has not rendered its initial decision on the protest and has not provided an updated deadline

for doing so. The initial decision is subject to tiers of administrative review, including by the FTA.

Harms has requested that the GDC extend its December 10 deadline. The request was made to give Harms the time needed for its protest to be considered and, if necessary, to exhaust all administrative remedies. But Harms' request for an extension has been ignored by the GDC. The GDC's refusal to grant Harms' request to extend the December 10 deadline moots the protest. Simply put, by the time Harms' protest goes through the tiers of administrative review there will be nothing left for Harms to protest.

Refusing to extend the December 10 deadline, and thereby mooting Harms' protest, inflicts immediate and substantial irreparable injury on Harms. There is no adequate remedy at law for Plaintiffs to redress the denial of their opportunity and right to bid or work on the Project for which it has been prequalified by the GDC. Additionally, there is no adequate remedy at law to redress the State and United States constitutional violations alleged herein.

The injunctive relief requested seeks nothing more than the preservation of the status quo by issuance of a Temporary Restraining Order ("TRO") that freezes bidding on the Project. While the TRO is pending, Harms would welcome an expedited Preliminary Injunction Hearing. Harms has no interest in preserving the

175876113.8

status quo any longer than necessary to protect its rights as a prequalified bidder and have these issues adjudicated in a timely manner.

The GDC's exclusion of the USW violates applicable state and federal laws, including antitrust laws, and the New Jersey and United States Constitutions.

## **PARTIES**

1.    Plaintiff Harms is a New Jersey Corporation engaged in the business of heavy highway, bridge, building, and rail construction and is a taxpayer in the State of New Jersey, headquartered at 62 Yellowbrook Road, Howell, New Jersey, 07731. *See* Certification of Rob Harms ("Harms Cert.") at ¶ 7 attached hereto as Exhibit ("Ex.") 1.

2.    Plaintiff Brian Burns is a member of USW Local 318 who works on Harms projects and is a taxpayer in the State of New Jersey who resides at 18201 Lambert Way, Freehold, New Jersey, 07728. *See* Certification of Brian Burns ("Burns Cert.") at ¶¶ 1-3 attached hereto as Ex. 2.

3.    Defendant GDC is a bi-state commission between New Jersey and New York with a New Jersey location of 2 Penn Plaza East, Newark, New Jersey, 07105.

4.    Defendant Grewal-Virk is a New Jersey Commissioner and Co-Chair of the Commission.

5.    Defendant Glen is a New York Commissioner and Co-Chair of the Commission.

175876113.8

6.    Defendant Coscia is the Amtrack Commissioner and Vice Chair of the Commission.

7.    Defendant Barbas is a New York Commissioner.

8.    Defendant Dominguez is a New York Commissioner.

9.    Defendant Rosen is a New Jersey Commissioner.

10.    Defendant Herlinsky, Jr. is a New Jersey Commissioner.

11.    Defendant Prendergast is Chief Executive Officer of the Commission.

12.    Defendant FTA is a federal agency responsible for the federal funding granted to the Project and is responsible for adjudicating any appeal of the protest filed by Harms.

13.    Defendant USDOT is a federal cabinet department that is responsible for the nation's transportation systems and oversees the FTA.

14.    JOHN DOES 1-20 are fictitious names of individuals whose identities are presently unknown to Plaintiffs but who engaged in or assisted Defendants with the unlawful acts set forth in this Complaint.

15.    ABC ENTITIES 1-10 are fictitious names of entities whose identities are presently unknown to Plaintiffs but who engaged in or assisted Defendants with the unlawful acts set forth in this Complaint.

## **JURISDICTION AND VENUE**

175876113.8

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as it arises under the Constitution and laws of the United States, the Sherman Act, the FTA, the Competition in Contracting Act, and the Federal Public Transportation Act of 2015.

17.     This Court likewise has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1343 because Plaintiffs bring claims alleging a deprivation of civil rights.

18.     Plaintiffs further invoke the supplemental jurisdiction of this Court pursuant to U.S.C. § 1367, which confers supplemental jurisdiction for claims arising under New Jersey law.

19.     Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the District of New Jersey and the GDC's authorizing legislation under N.J.S.A. 32:36-8(b) identifies this as a proper venue.

20.     Pursuant to GDC's bid protest procedure and the bid specifications at issue, Harms filed a bid protest with the GDC challenging the exclusion of the USW from this PLA. *See* Ex. 3, Bid Protest.

21.     As explained further herein, due to the GDC's refusal to extend the bid submission deadline of December 10, 2025, and the GDC Protest Officer's unwillingness to provide a date certain to render a decision on Harms' protest,

175876113.8

exhaustion of administrative remedies is futile and Plaintiffs will suffer irreparable injury if these matters are not addressed by the Court immediately. *See* Ex. 1, Harms Cert. at ¶¶ 22-29.

22.    Conversely, the Defendants will suffer no prejudice by proceeding in this manner because, according to President Trump, the HTP is currently "terminated" and federal funds have been frozen pending further review by the USDOT.

23.    Despite the HTP's current status, the GDC has not given any indication that it is altering the current bid schedule, and therefore, Plaintiffs bring this action to seek immediate redress.

## **FACTS**

### I.    **GDC's use of an Unlawful Project Labor Agreement Bid Specification to Eliminate Competition.**

### A.    **The GDC's Creation, Powers and Duties.**

24.    The GDC is a "a public and government sponsored authority established by bi-state legislation (the 'GDC Act') in July 2019."[1]

25.    It was created to "formalize that bi-state cooperative effort" to rebuild and repair the commuter rail infrastructure between New Jersey and New York. *N.J.S.A.* 32:36-2.

---

[1] GDC-Board-Resolution-Palisades-PLA-for-Website-5-3-24.pdf

175876113.8

26.    In furtherance of that goal, the GDC Act confers certain powers and requires the Board of Commissioners to exercise them as fiduciaries "in the best interest of the Commission, its mission, and the public." *N.J.S.A.* 32:36-5(j).

27.    These duties are so important that the GDC Act requires commissioners to be trained on their "legal, fiduciary, financial and ethical responsibilities . . . within six months of appointment to the Commission" and thereafter as required to be informed of "best practices" "and adhere to the highest standards of responsible governance." *N.J.S.A.* 32:36-5(k).

28.    The GDC Act requires commissioners and officers and employees in policy making positions to provide annual financial disclosures. *N.J.S.A.* 32:36-5(m).

29.    They are required to conduct their business in the open for the public to observe "the full details of all phases of the deliberation, policymaking, and decision-making of the board." *N.J.S.A.* 32:36-6(f)(i)(l).

30.    Commissioners take oaths to uphold the Constitutions of New Jersey and New York. *N.J.S.A.* 32:36-4(i).

31.    As the goal of the GDC is to rebuild and repair the commuter rail infrastructure, the GDC Act authorizes the GDC to enter into contracts to carry out powers of the commission. *N.J.S.A.* 32:36-8(e).

32.     There are limits to that power within the GDC Act, including requiring the GDC to promulgate and comply with procurement guidelines, *N.J.S.A.* 32:36-8(h), that ensure contractors are selected on a "competitive basis," *N.J.S.A.* 32:36-16(g)(3)(b)(i), and requiring the GDC to ensure its bid process is free from collusion or restriction of competition. *N.J.S.A.* 32:36-16(f).

33.     The GDC Act empowers the GDC to "[u]tilize the existing labor force in the states and foster labor harmony in allowing for adoption of efficient labor work rules and practices during construction of the Project." *N.J.S.A.* 32:36-8(q).

34.     Consistent with its obligations under the GDC Act, the GDC adopted its own procurement rules and guidelines on November 16, 2021 ("Procurement Guidelines"). *N.J.S.A.* 32:36-8(h).

35.     The GDC must ensure that pricing for any bids "ha[s] been arrived at independently without collusion, consultation, communication, or agreement, for the purpose of restricting competition". *See N.J.S.A.* 32:36-16(f).

36.     The Procurement Guidelines repeatedly require contracts be awarded on a "competitive basis" and reference "fair" competition and "fair and equal treatment" of Proposers. *See* Ex. 3(F), at II.B(2), C(1), C(2) and C(4)).

37.     These guidelines likewise prohibit the GDC from "restricting competition" considering any bid or award any contract where competition is restricted. *See* Ex. 3(F), at IV(B).

175876113.8

38.    The Procurement Guidelines are drafted to ensure open competition with as many bidders competing as possible.

39.    The GDC is bound by the Project Development Agreement (the "PDA") entered in by the GDC, New Jersey, New York, and the National Railroad Passenger Corporation on or about February 3, 2023.

40.    The PDA addresses, among other things, what law applies to labor issues and requires New Jersey labor law to apply to work being performed in New Jersey. *See* Ex. 3(G)*,* PDA, Article IV.

41.    An exception to New Jersey labor law applying to labor issues arising from New Jersey work is if there is federal funding.  If there is federal funding, the funding agreement requirements supersede otherwise applicable state law.

42.    The sources of funding for the GDC are $12 billion in federal taxpayer monies and $4 billion from local partners. The federal funding sources are $6.88 billion from the FTA Capital Investment Grant ("CIG") Program, $3.8 billion from the Federal Railroad Administration, $4.06 billion in low-interest loans from the Build America Bureau, $1.016 billion from Amtrak, and approximately $300 million from the Bipartisan Infrastructure Act.

43.    By accepting approximately $12 billion of federal funding, the GDC is required to comply with all federal, state and local laws, regulations and

175876113.8

requirements, including all federal appropriations requirements. *See* Ex. 3(G), (Relevant excerpts of the PDA at §4.01(b) and §§4.04(a)).

44.    Here, that includes, 2 CFR Part 200 ("Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards"), 41 U.S.C § 107, 41 U.S.C. § 3301(a), 49 U.S.C. § 5325(a), 49 U.S.C. § 5325(h), 2 CFR § 200.319, 48 CFR 22.222-34(c)(2), 48 CFR 22..504(c), FAR §3.101-1 and any federal funding requiring and financing agreements. *See* Ex. 3(G), PDA at § 6.01(a)(1); § 19.01(a).

45.    The federal requirements dictate that the GDC ensure "maximum competition" on the Project through its procurement process. *See* 2 CFR § 200.319(e).

46.    The federal requirements include a prohibition on implementing bid specifications that place potential bidders on unequal footing. *See* 2 CFR § 200.319(c).

**B.    GDC Use of Anticompetitive and Discriminatory PLAs on Hudson Tunnel Project.**

47.    The primary aspect of the Gateway Development Program is the HTP, which is broken up into multiple contracts.

48.    One of those contracts is the New Jersey Surface Alignment Project (the "Project").

175876113.8

49.     The Project is a "design-build," meaning that the awarded contractor would not only build but also design the project.

50.     The GDC required all interested bidders to prequalify before receiving the Request for Proposal ("RFP") packet and announced the Request for Qualifications ("RFQ") on or about November 7, 2024, with responses due January 14, 2025.

51.     To prequalify, Harms had to demonstrate its technical qualifications and financial capacity, including consideration of the skill, experience, and availability of its workforce, organized with the USW. *See* Ex. 3(P) at pp. 21-25.

52.     On February 26, 2025, Harms was prequalified along with three other teams for the Project.[2] *See* Ex. 1, Harms Cert. at ¶¶ 9-13.

53.     Each of these other teams has workforces represented only by Building Trades unions.

54.     Harms incurred significant expense to prepare for and become prequalified for this Project with the intention of bidding for the work.

55.     There was no mention of use of a PLA in the prequalification documents or original RFP.  *See* Ex. 1, Harms Cert. at ¶¶ 9-13.

56.     Had the GDC intended to use a PLA, it could have included it in either the RFQ process or original RFP – and had done so in past projects.

---

[2] 2025.02.26_New-Jersey-Surface-Alignment_Notice-of-Shortlist-for-website.pdf

175876113.8

57.    Had the PLA been included originally, Harms could have considered its impact on their ability to bid the Project before incurring the costs of becoming a prequalified bidder.

58.    When the GDC used a PLA on earlier contracts, it was announced with the RFQ.

59.    On one such earlier project, the Palisades Tunnel Project (the "Palisades Project"), the PLA was announced over seven months before the RFQ.

60.    Harms carefully followed the Palisades Project because it anticipated bidding on future projects and feared the GDC would use a PLA that precludes it from doing so.

61.    It even wrote to the CEO of the GDC prior to announcement of the Palisades Project PLA to explain that a PLA that excludes a qualified source of labor violates the labor laws of New Jersey. *See* Ex. 3(J), May 2, 2023 Letter.

62.    Notwithstanding, the GDC announced an exclusionary, discriminatory, and anticompetitive PLA in the Palisades Project anyway.

63.    Concerned about the use of a similar PLA on future projects, both Harms and the USW objected to the Palisades Project PLA.

64.    Harms and the USW contacted representatives of the New Jersey Governor's Office, which holds veto power over the actions of the New Jersey commissions, about the Palisades Project PLA in an effort to ensure that a similar

175876113.8

PLA would not be used on future projects. *See* Ex. 3(M), May 9, 2024 Letter from USW to Gov. Murphy.

65.     That letter explained that the USW is recognized as a qualified source of labor by the New Jersey Department of Labor and "Excluding the USW from the Project would be arbitrary and would not serve to promote labor harmony or any other legitimate interest." *Id.*

66.     It specifically notified the Governor that "[s]ince 1994, the USW and North America's Building Trades Unions (NABTU) and their local union affiliates have operated under a 'Harmony Agreement' permitting workers represented by NABTU and the USW to work side by side on the same work projects in New Jersey and to obviate jurisdictional disputes between them. As PLAs have become more prevalent, both organizations have been included as signatories to PLAs for significant projects." *Id.*

67.     A response from the Governor's office said that the information that was provided was communicated to relevant parties. *See* Ex. 3(N), August 28, 2024 Letter.

68.     On the Palisades Project, the GDC claimed to have a "study" that examined and supported use of a PLA on the Project.[3]

---

[3]    GDC-Board-Resolution-Palisades-PLA-for-Website-5-3-24.pdf ("The Commission has engaged, via its outside counsel, a consultant to conduct a study to determine that it is in the Commission's interest to negotiate and execute a project labor agreement for Palisades based on

69.     However, the GDC refused to provide it upon an open public records request, despite relying on it in the Resolution.

70.     The GDC did, however, produce internal communications that demonstrate that the Palisades PLA was drafted by and negotiated exclusively with the Building Trades for the benefit of their own members and to the exclusion of all other qualified sources of labor. *See* Ex. 3(O), August 6, 2024 Letter (with enclosures of May 6, 2024 request).

71.     What was produced shows that the Defendants abdicated their control over this bid specification to the Building Trades.

72.     USW was not invited to participate in this negotiation, and Defendants have hidden whether the study it relied upon even considered the USW.

73.     Despite both Harms and the USW directly telling the GDC that its use of a PLA similar to the Palisades Project on future projects would preclude Harms from bidding, the GDC implemented a similar PLA for the Project, after Harms was prequalified, that excludes the USW for the benefit of the Building Trades based upon its prior collusion with and commitment to the Building Trades as evidenced on the Palisades Project.

**C.     GDC Deliberately Excluded USW After Harms Prequalified.**

---

considerations such as the impact of delay, the possibility of cost savings advantages, and the promotion of labor harmony which are best met by requiring a project labor agreement. The labor study recommends that the Commission negotiate and execute a project labor agreement for Palisades.").

175876113.8

74.    GDC released the RFQ for the Project on or about November 7, 2024.

75.    GDC prequalified Harms on February 26, 2025 as one of four shortlisted bid-teams. *See* Ex. 3(B), ¶ 25; Ex. 3(R).

76.    Two days after announcing prequalification, the Project moved to phase two – when the GDC released the RFPs on February 28, 2025.

77.    The draft RFP said the GDC was still assessing whether to use a PLA, and there was zero indication that any PLA used would exclude the USW, particularly given that the GDC was aware that Harms is organized with the USW.

78.    On April 14, 2025, in a one-on-one meeting, the GDC indicated, for the first time, that it anticipated using a PLA like the one for the Palisades Project on this Project. *See* Ex. 3(B), ¶ 28. Harms immediately communicated that such an exclusionary PLA would violate the law, including New Jersey Supreme Court precedent. *Id.* at ¶ 29.

79.    On July 14, 2025, the International President of the USW wrote to the GDC explaining that the USW is a qualified local source of labor, there is a Harmony Agreement allowing the USW to work alongside the building trades, and exclusion of the USW precludes Harms from bidding. *See* Ex. 3(W).

80.    On July 25, 2025, the GDC announced the agenda for the July 28, 2025 Board meeting, which included Item #0725-04, "Hudson Tunnel Project – NJ

Surface Alignment – Delegation of Authority to Chief Executive Officer to Execute Labor Agreement."

81.    This was the first public mention of the GDC's decision to use a PLA, and until the Resolution was provided – a day or so later – it was entirely unclear whether the USW would be included or excluded in such decision.

82.    The proposed resolution, released only a day before the meeting, identified only Building Trades unions – and unlike the resolutions of the Palisades PLA, did not include the proposed PLA.

83.    The USW submitted a written comment opposing the PLA's exclusion and requesting inclusion, reiterating the points raised in the USW's July 14th letter. *See* Ex. 3(Z).

84.    Rob Harms and counsel appeared and objected to use of a PLA that excluded the USW, noting that if the USW remains excluded from the PLA, Harms cannot bid, and that this exclusion violates the laws to which the GDC is bound.  *See* Ex. 3(Y).

85.    Following the comment and an executive session, the GDC revised the proposed resolution to remove the specific reference to the Building Trades and replaced them with "relevant unions", requiring the Chief Executive Officer to negotiation with the relevant trades and requiring another vote on the final PLA. *See* Ex. 3(Y).

86.    Harms was hopeful these changes meant the GDC would include USW.

87.    On August 8, 2025, USW again wrote to the GDC seeking inclusion of the USW. *See* Ex. 3(AA).

88.    Harms submitted an RFI asking if the GDC would include the USW. *See* Ex. 3(EE).

89.    There was no answer until **after** the Commission voted to approve a PLA excluding the USW. *Id.*

90.    The GDC announced the Final RFP on August 18, 2025 and the Design-Build Agreement still did not state whether the GDC would require a PLA. *See* Ex. 3(U), at 57.

91.    This was *after* the GDC had approved negotiation of a PLA, and it appeared simply unclear which unions it would include.

92.    At the public meeting on August 20, 2025, Harms again objected by public comment – highlighting that the GDC has done nothing since the last meeting to include the USW and reiterated that "Harms cannot lawfully submit a bid under the PLA that excludes the [USW]". *See* Ex. 3(BB).

93.    The USW also appeared at this public meeting to again specifically ask for the USW's inclusion. *See* Ex. 3(BB).

94.    The GDC Commissioners then voted unanimously to use a discriminatory, exclusionary, and anticompetitive PLA that excluded the USW from

175876113.8

the Project and precluded Harms from bidding – ensuring all the work will go to the Building Trades, eliminating competition, and depriving the GDC and the public of the benefits of working with all qualified sources of labor.

### D. The PLA Prevents Harms from Bidding the Project.

95. The adopted PLA is between the GDC and the Building Trades, which is comprised of several single skilled local unions.

96. Article 2, Section 3 of the PLA makes it "binding on all signatory Unions and contractors performing Project Work" as well as all "subcontractors."

97. The PLA is mandatory and without exceptions.

98. It requires the successful bidder to:

a. Recognize the Building Trades as the "sole and exclusive bargaining representative of all craft employees who are performing on-site Project work within the scope of this Agreement" *See* Ex. 3(L) at Art. 4, § 1.

b. Comply with the collective bargaining agreements of the Building Trades unions, including contributing to their funds through the payment of fringe benefits.

c. Sign a "letter of assent" certifying that is has "no commitments or agreements that would preclude its full compliance with the terms and conditions of said Project Labor Agreement." *See* Ex. 3(L).

175876113.8

d. Hire from Building Trades hiring halls for no less than 88% of its workforce rather than use its pre-existing employees, Ex. 3(L), Art. 4, §2.A(1). And those employees that can work the job must disavow any preexisting union affiliation and recognize the Building Trades as their sole bargaining representative. *See* Ex. 3(L), Art. IV, §2.B. *See* Ex. 1, Harms Cert. at ¶¶ 14-20; Certification of Paul Silber ("Silber Cert.") attached hereto as Ex. 4 at ¶ 22-23.

99. The PLA prevents Harms, and other similarly situated contractors, from bidding because Harms cannot recognize another union as the representative of its workforce under its CBA with the USW and therefore cannot sign the letter of assent. *See* Ex. 1, Harms Cert. at ¶ 9-13.

100. Critically, the PLA requires Plaintiffs to associate with and provide financial support to a union that actively works to damage Harms' business interests, and infringe upon Burns' fundamental rights, through loss of fringe benefits, political initiatives and lobbying efforts that deprive Plaintiffs of opportunities. *See* Ex. 1, Harms Cert. at ¶ 15; Ex. 4, Silber Cert. at ¶¶ 9-20, 24.

101. Harms and the USW communicated all of this before the vote, but the CEO and co-chair of the GDC still claimed Harms was free to bid.

102. That was knowingly false.

103.   Harms is the only short-listed bidder who would be required to breach its pre-existing CBA to bid and would be unable to sign the letter of assent.  *See* Ex. 1, Harms Cert. at ¶¶ 14-20.

104.   In addition, Harms is being punished financially by depriving it of the ability to bid on the Project after spending time, money, and resources to become prequalified.  *See* Ex. 1, Harms Cert. at ¶ 9.

105.   To that end, the Project documents contain a stipend of $1.2 million for unsuccessful bidders that submit a conforming bid.

106.   The stipend is to encourage bidding without fear of financial loss.

107.   However, the stipend is conditioned upon an unsuccessful contractor waiving its right to protest the bid award, which has a chilling effect on potential challenges, including for the constitutional issues raised herein.

108.   Harms is the only contractor to be denied the stipend for time spent on the RFQ and RFP as a direct result of its fundamental right to associate with the USW.

109.   The readoption of a PLA that is substantially similar to the PLA used on the Palisades Project, which was drafted by and negotiated exclusively with the Building Trades, coupled with the GDC's stated intention of using PLAs on future phases of the HTP, demonstrate a concerted discriminatory and anticompetitive effort to exclude non-Building Trades contractors from the HTP.

110.    The GDC has never offered a lawful explanation for exclusion of the USW.

111.    The assertion that Harms is "free to bid" is a pretext to the unlawful motive for exclusion of USW.

112.    By excluding Harms from bidding, the GDC is intentionally reducing the pool of bidders from 4 to 3, thereby eliminating 25% of the competition from the Project.

113.    Less competition on the Project decreases competitive pressure and eliminates the incentive for aggressive bidding, which will increase the overall Project costs.

**E.    Harms Filed a Protest but Faces Imminent Harm if not Addressed Immediately, Rendering Exhaustion of Administrative Remedies Futile.**

114.    On October 8, 2025, Harms filed a timely formal protest pursuant to the GDC's Protest Procedures. *See* Ex. 3.

115.    The GDC appointed a "Protest Officer" on October 14, 2025 to review the protest and issue a written decision within thirty days "when feasible."

116.    On October 29, 2025, Harms wrote to the GDC requesting a hearing and for the Protest Officer to provide certain information about her review to ensure fairness in the proceedings. *See* Ex. 5, October 29 Letter.

175876113.8

117.   Given the bid deadline currently remains December 10, 2025, and has not been extended, Harms requested a prompt response.

118.   On November 10, 2025, the Protest Officer responded to Harms' letter by stating that more time was needed to render its decision, but did not provide a deadline for doing so.  *See* Ex. 6, November 10 Letter.

119.   Nor did the Protest Officer's letter state that the bid deadline would be moved from December 10, 2025.  *Id.*

120.   The Protest Officer also rejected Harms' request for a hearing, stating that she did not have any questions at this time and that a hearing is not "presently contemplated."  *Id.*

121.   On November 11, 2025, Harms wrote again to the Protest Officer to raise several issues:

    a.   Requesting the bid deadline be moved to provide ample opportunity for the protest to be heard;

    b.   Requesting information about the Protest Officer's background and experience to hear the protest; and

    c.   Raising a potential conflict of interest based on the fact that any appeal of the Protest Officer's decision would be made to the person who appointed her.

    *See* Ex. 7, November 11 Letter.

122.   Given that the Protest Officer has not rendered a decision on the protest and the uncertainty in the timing of such decision, a fair and full resolution of this matter prior to the bid date is impossible.

123.   In addition, once the Protest Officer renders a decision, it can be appealed to the Senior Director of Procurement ("SDP") at the GDC.

124.   From there, because of the federal funding, the SDP's decision can be appealed to the FTA.

125.   If the bids are submitted prior to a final decision on Harms' protest, it will moot the bid protest and deprive Harms of an opportunity to bid on the Project and leave Harms with no adequate remedy at law.

126.   That makes the exhaustion of administrative remedies futile.

127.   Moreover, this matter raises significant constitutional questions both in the bid protest and herein, that the GDC lacks authority to decide through its administrative procedures.

128.   In addition to the foregoing, exhaustion of administrative remedies should be excused here because failing to do so will undermine the public interest in a fair and open bid process for the largest infrastructure project in the country.

129.   The violation of Plaintiffs' constitutional rights, as alleged herein, is a per se irreparable injury for which there is no adequate remedy at law. *See* Harms Cert. at ¶¶ 22-37.

175876113.8

130.   Unless an injunction is granted, the GDC's PLA will preclude Harms from forever having the opportunity to bid on the Project contract for which there is no adequate remedy at law.  *Id.*

131.   Precluding Harms from forever having the opportunity to bid on the Project contract damages Harms' reputation, diminishes Harms' ability to improve its reputation, and undermines its current and future competitive position in ways that money cannot fully measure. *Id.*

## COUNT ONE

**(The PLA is *Ultra Vires*, Void, and Illegal as a Violation of the GDC Act, *N.J.S.A.* 32:36-1 *et seq.*)**

132.   Plaintiffs repeat and reallege each of the Paragraphs above as if set forth fully herein.

133.   The GDC is a creature of the GDC Act, codified through *N.J.S.A.* 32:36-1 *et seq.* and is, therefore, bound to act strictly within the scope of authority delegated to it under the Act.

134.   The GDC Act narrowly, unambiguously, and specifically limits the GDC's authority to facilitating the planning, financing, and construction of the HTP.

135.   The GDC Act does not expressly or impliedly authorize the GDC to dictate labor relations.

136.   The GDC Act does not expressly or impliedly authorize the GDC to coerce union affiliation.

26

137.   The GDC Act does not expressly or impliedly authorize the GDC to coerce contractors to financially support unions or to endorse social, political, or other union positions.

138.   The GDC Act requires the GDC to use all available labor without exclusion on its projects. *See N.J.S.A.* 32:36-8.

139.   Despite this, the GDC has arbitrarily and unreasonably excluded a qualified source of labor without justification.

140.   The GDC Act also requires the GDC to "adopt its own procurement rules and guidelines." *N.J.S.A.* 32:36-8(h).

141.   The Procurement Guidelines repeatedly require contracts be awarded on a "competitive basis" and reference "fair" competition and "fair and equal treatment" of Proposers. Similarly, the RFQ explicitly states that it is intended to "promote a fair and unbiased procurement process for the Project."

142.   Despite this, the GDC has implemented a PLA that precludes Harms from bidding.

143.   The GDC's PLA imposes terms and conditions on Harms and its workforce that have no rational connection to the planning, financing, or construction of infrastructure projects.

144.   Because the GDC's PLA is not directly or indirectly authorized by the Act, it is *ultra vires*, void, and illegal.

27

145.   The GDC's PLA is *ultra vires*, void, and illegal because the GDC Act not only does not authorize but actually prohibits the GDC's adoption of the PLA, inter alia, for the following reasons:

a.   It stifles competition by narrowing the pool of prequalified contractors;

b.   It discriminates against Plaintiffs;

c.   It excludes Harms from bidding on or being awarded the Project contract:

d.   It was negotiated behind closed doors that were not open to the public or media;

e.   It does not take into account any performance evaluative criteria;

f.   It excludes, on a non-performance evaluative basis, the USW, including Burns, and every other qualified source of labor not favored by the GDC;

g.   It violates federal procurement laws and federal conditions upon the receipt of $12 billion in federal funds for the HTP and, thereby, puts at risk all federal funding for the HTP;

h.   It compels Plaintiffs to associate with and financially support unions against Plaintiffs' will and in violation of its constitutional right against compelled association;

175876113.8

i.   It promotes labor disharmony and discord, contrary to the GDC's stated goals for adopting the PLA;

j.   It violates longstanding New Jersey public bidding laws and public policy favoring fair and open competition for public contracts;

k.   It fails to consider broader and fair competitive means to achieve the GDC's stated goals for adopting the PLA;

l.   It fails to promote the public interest; and

m.  It breaches fiduciary duties owed to the taxpayers who are funding the Project.

## **COUNT TWO**

### **(42 U.S.C. § 1983 First Amendment)**

146.   Plaintiffs repeat and reallege each of the Paragraphs above as if set forth fully herein.

147.   Plaintiffs are entitled to relief under 42 U.S.C. § 1983.  Acting under color of state law, the GDC is engaging in conduct with the knowledge that such conduct would have the effect of denying Plaintiffs' and USW's First Amendment rights to freedom of association and freedom from coerced association.

148.   Freedom of association is a fundamental right; the GDC is violating Plaintiffs' First Amendment rights by punishing Harms and the USW members, who

175876113.8

are parties to an existing collective bargaining agreement, for associating with the USW by including a PLA that excludes the USW and prevents Harms from bidding.

149.   The GDC is further violating Plaintiffs' First Amendment rights by compelling speech in the form of 1) enacting a PLA that requires contractors and their employees to associate with particular unions as a condition of working on a public project, 2) forcing speech through the form of required payments to a union through dues and/or contribution to benefit plans. These actions plainly violate Plaintiffs' First Amendment protections.

150.   The PLA at issue here unlawfully discriminates against contractors and workers based on their labor affiliation. *See Road-Con, Inc. v. City of Philadelphia*, 120 F.4th 346, 354 (3d Cir. 2024).

151.   The GDC drafted the PLA in a manner designed to ensure that the Project could only be awarded to a contractor organized by the Building Trades and NOT any other contractor.

152.   Defendants, in collusion with the Building Trades, John Does, and/or ABC Entities, have willfully, wantonly, or recklessly violated the First Amendment rights of Plaintiffs by excluding Harms from the Project as punishment for their association with the USW.

175876113.8

153.   Plaintiffs are harmed by the PLA provisions prohibiting the submission of a bid due to union affiliation, which constitutes a violation of the Freedom of Association Clause under the First Amendment of the United States Constitution.

## COUNT THREE

### (42 U.S.C. § 1983 Due Process)

154.   Plaintiffs repeat and reallege each of the Paragraphs above as if set forth fully herein.

155.   42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, ...."

156.   The PLA constitutes a deprivation of rights, privileges and immunities secured by the United States Constitution, federal law and state law. Plaintiffs and the USW members, were ready, willing, and able to bid and/or perform construction services on the Project, but because of the unreasonable and unlawful requirements contained in the PLA and imposed by the GDC, Plaintiffs and the USW have been denied an opportunity to obtain work on the Project.

157.   Defendants violated Plaintiffs' procedural due process by:

175876113.8

a.  engaging in unjust and arbitrary governmental action;

b.  late decision to include a PLA after RFQ and RFP;

c.  failure to undertake a good-faith consideration of public comment;

d.  rejection of attempts by affected parties to discuss the PLA;

e.  refusal to provide those parties with the very feasibility study that it based its decision on violated;

f.  adoption of an exclusive PLA, reached through closed-door coordination with the Building Trades; and

g.  depriving only Harms of the ability to collect the stipend provided for in the RFP by adding a later PLA that meant Harms could not submit a conforming bid because it could not sign the letter of assent.

158.  Defendants, acting under color of law, have, in violation of 42 U.S.C. § 1983, are willfully, wantonly, or recklessly depriving Plaintiffs of their rights, privileges and immunities secured by federal and state law.

## **COUNT FOUR**

### **(42 U.S.C. § 1983 Equal Protection)**

159.  Plaintiffs repeat and reallege each of the Paragraphs above as if set forth fully herein.

160.  Plaintiffs are entitled to relief under 42 U.S.C. § 1983. Acting under color of state law, the GDC is willfully, wantonly, or recklessly engaging in conduct

with the knowledge that such conduct has the effect of denying Plaintiffs their Fourteenth Amendment right to Equal Protection.

161.   The Fourteenth Amendment forbids government from disadvantaging a discrete group for its own sake or to channel benefits to a rival group. *United States Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973)( "a bare … desire to harm a politically unpopular group cannot constitute a legitimate governmental interest"); see *Romer v. Evans*, 517 U.S. 620, 634–35 (1996) (invalidating measure "born of animosity" toward a class).

162.   Hostility toward a disfavored union is not a valid governmental end so the Commission's deliberate exclusion of the USW belies a legitimate governmental purpose. *Romer*, 517 U.S. at 634–35.

163.   The Project PLA has the effect of discriminating against Plaintiffs and the USW in the public procurement process and precluding the award of work of the Project to Harms and other USW contractors because the PLA was created based upon favoritism designed to exclude a specific labor organization.

164.   This PLA results in unequal treatment on the basis of union affiliation and is without a compelling interest or rational basis in that Harms and the USW possess the requisite skill, ability, and integrity, and are fully capable of performing the work of the Project in a timely, efficient, and cost-effective manner.

165.    As a result of the continuing arbitrary, capricious and unlawful conduct of the GDC, Plaintiffs have sustained and continue to be harmed by the violation of their Fourteenth Amendment Equal Protection Rights.

## COUNT FIVE

### (New Jersey Constitution)

166.    Plaintiffs repeat and reallege each of the Paragraphs above as if set forth fully herein.

167.    In violation of *N.J.S.A.* 10:6-2, as described in Counts I-III, which are incorporated by reference herein, the GDC is willfully, wantonly, or recklessly violating Plaintiffs' federal due process and equal protection rights, as well as their rights under the First Amendment.

168.    In addition, in violation of *N.J.S.A.* 10:6-2, the GDC is willfully, wantonly, or recklessly depriving Plaintiffs of their rights under the Constitution and laws of New Jersey.  Plaintiffs have a state right to fairly compete and freely associate, and such right was denied by the GDC.  For the same reasons outlined in Counts One – Four, *supra*, the GDC is depriving Plaintiffs of their due process, equal protection, and First Amendment rights under the New Jersey Constitution.

169. In addition, under paragraph 19, Article I of the New Jersey Constitution, "[p]ersons in private employment shall have the right to organize and

bargain collectively." The PLA has interfered with Plaintiffs' and the USW's right to collectively bargain with a union of their choosing.

## COUNT SIX

### (Sherman Act, 15 U.S.C. § 1 et seq.)

170.    Plaintiffs repeat and reallege each of the Paragraphs above as if set forth fully herein.

171.    The GDC's exclusionary PLA is an unreasonable restraint on trade that will affect the prices, quantity or quality of goods or services to the public on the Project – the exact harm the Sherman Act is designed to protect.

172.    The GDC conspired with the Building Trades to implement a PLA that ensures that only contractors affiliated with those unions can bid on GDC projects, thereby harming competition in the New Jersey construction market on public works projects totaling nearly $16 billion.

173.    Harms is precluded from bidding through the deliberate exclusion of USW in the PLA, which has the anticompetitive effect of eliminating 25% of the competition on this Project.

## COUNT SEVEN

### (Declaratory Judgment)

174.    Plaintiffs repeat and reallege each of the Paragraphs above as if set forth fully herein.

175876113.8

175.    Plaintiffs are entitled to a declaration under *N.J.S.A.* 2A:16-50, et seq. that the PLA violates the United States Constitution and New Jersey Constitution by infringing upon the fundamental rights of free speech, free association, equal protection and due process under the law.

176.    Plaintiffs are entitled to a declaration that the GDC is bound by and violated:

    a.  New Jersey Labor Law, including the New Jersey PLA Act;

    b.  The Competition in Contracting Act ("CICA");

    c.  The Federal Transit Administration ("FTA") procurement laws, including Federal Public Transportation Act of 2015;

    d.  The GDC's own Procurement Guidelines; and

    e.  Competitive bidding laws of New Jersey and New York.

177.    Harms is further entitled to a declaration that the GDC exceeded the scope of its authority under the GDC Act by adopting a PLA that is anticompetitive, discriminatory, and/or exclusionary and therefore, the GDC's actions are *ultra vires*.

178.    GDC's unlawful act of using a PLA that unlawfully excludes a qualified labor organization is capable of repetition and may evade review.

179.    An actual and justiciable dispute exists between the parties for which Harms lacks an adequate remedy at law and is entitled to a declaration of rights from the Court.

WHEREFORE, Plaintiffs seek declaratory judgment as outlined above; preliminary and permanent injunction ordering Defendants to cease the unconstitutional and anticompetitive conduct described herein and to take all necessary action to remedy the effects of their unconstitutional conduct; any compensatory and punitive damages permitted by law, attorney's fees and costs, and any other and further relief as this Court may deem just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Judgment in Plaintiffs' favor declaring and adjudging that the use of the PLA for the Project violates the United States Constitution and New Jersey Constitution by infringing upon the fundamental rights of free speech, free association, equal protection and due process guaranteed under the law;

B.    Judgment in Plaintiffs' favor declaring and adjudging that the GDC's anticompetitive, discriminatory, and exclusionary PLA is *ultra vires*, null, void, illegal, and of no force or effect;

C.    Judgment in Plaintiffs' favor declaring and adjudging that the GDC's anticompetitive, discriminatory, and exclusionary PLA is an unlawful restraint on trade in violation of the Sherman Act;

D.    Judgment in Plaintiffs' favor declaring and adjudging that the GDC's anticompetitive, discriminatory, and exclusionary PLA violates the

175876113.8

competitive bidding requirements of GDC, including the PLA Act, and requirements for the receipt of federal funding;

E.       Temporarily, preliminarily and permanently enjoining the GDC and its agents, officers, employees, attorneys, and anyone else acting in concert with them who receives notice, from implementing or enforcing the discriminatory and exclusionary PLA and from taking any further action including, but not limited to, receiving or considering bids for the Project contract or awarding a contract for the Project based on compliance by bidders with the discriminatory and exclusionary PLA;

F.       Compelling the GDC to rebid the Project contract without the discriminatory and exclusionary PLA;

G.       Harms' cost to submit its Request for Qualification and costs to prepare a bid proposal;

H.       Granting Plaintiffs' attorney's fees and costs of suit; and

I.       Any other and further relief as this Court may deem just and proper.

175876113.8

## <u>CERTIFICATION PURSUANT TO LOCAL RULE 11.2.</u>

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that the matter in controversy is not subject to any other action pending in any court.

**FOX ROTHSCHILD LLP**

Dated: November 19, 2025                    By: _____

Francis V. Cook, Esq.
Jonathan D. Ash, Esq.
Corinne B. DeBerry, Esq.
212 Carnegie Center
Suite 400
Princeton, NJ 08540
(609) 896-3600
*Attorneys for Plaintiffs*