**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHAMBERS OF<br>**SUSAN D. WIGENTON**<br>UNITED STATES DISTRICT JUDGE | MARTIN LUTHER KING COURTHOUSE<br>50 WALNUT ST.<br>NEWARK, NJ 07101<br>973-645-5903 |

December 11, 2025

Francis V. Cook
Fox Rothschild LLP
212 Carnegie Center
Suite 400
Princeton, NJ 08540
*Counsel for Plaintiffs*

Ronald J. Riccio
McElroy, Deutsch, Mulvaney & Carpenter, LLP
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, NJ 07962
*Counsel for Plaintiffs*

Mitchell W. Taraschi
Connell Foley
85 Livingston Avenue
Roseland, NJ 07068
*Counsel for Plaintiffs*

Noel Hillman
Gibbons, P.C.
One Gateway Center
1145 Raymond Plaza West
Newark, NJ 07102
*Counsel for Defendants Gateway Dev. Comm'n & its Commissioners*

Angelo J. Genova
Genova Burns LLC
494 Broad Street
Newark, NJ 07102
*Counsel for Defendants Gateway Dev. Comm'n & its Commissioners*

Frederick W. Alworth
Gibbons, P.C.
One Gateway Center
1145 Raymond Plaza West
Newark, NJ 07102
*Counsel for Defendants Gateway Dev. Comm'n & its Commissioners*

Kevin R. Reich
Gibbons, P.C.
One Gateway Center
1145 Raymond Plaza West
Newark, NJ 07102
*Counsel for Defendants Gateway Dev. Comm'n & its Commissioners*

John F. Basiak
U.S. Attorney's Office
402 E. State Street, Room 430
Trenton, NJ 08608
*Counsel for Defendants the Federal Transit Admin. & U.S. Dep't of Transp.*

### LETTER OPINION FILED WITH THE CLERK OF THE COURT

Re:  *George Harms Construction Co., Inc. et al. v. Gateway Development Commission et al.*, Civ. No. 25-17679 (SDW) (JRA)

Counsel:

Before this Court is Plaintiffs George Harms Construction Co., Inc. and Brian Burns's ("Plaintiffs") Motion for a Temporary Restraining Order ("TRO") (D.E. 3 ("Motion")) pursuant to Federal Rule of Civil Procedure ("Rule") 65 and Local Civil Rule ("Local Rule") 65.1.  For the reasons set forth herein, Plaintiffs' Motion is **DENIED**.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

This Court writes only for the parties and accordingly limits its discussion of the factual and procedural background to only the facts pertinent to the instant decision.

**A. Factual Background**

The crux of this case is whether Defendants the Gateway Development Commission's ("GDC" or "the Commission") adoption of a project labor agreement ("PLA") excludes Plaintiffs from bidding on the New Jersey Surface Alignment Project and whether that exclusion, if found, violates federal and state law.

GDC, a bi-state commission formed in 2019 between New Jersey and New York, was awarded $16 billion in public funds from the federal and both state governments "to rebuild and

repair the commuter rail infrastructure" between these two states—otherwise known as the Hudson Tunnel Project ("HTP"). (D.E. 1 ("Compl.") at 2; ¶¶ 3, 24.) The HTP is comprised of ten different "but highly interdependent construction projects." (D.E. 18-2, Rinaldi Decl. ¶ 2.) At issue in this case is the P3 New Jersey Surface Alignment Project ("P3 NJSA Project" or "the Project"), which is under active procurement.[1] (*Id.* ¶¶ 3, 5(a); Compl. ¶¶ 47–48.) The deadline to submit bids on the P3 NJSA Project is December 10, 2025 and GDC expects to award the bid in February 2026. (Rinaldi Decl. ¶ 16; Compl. ¶ 21.)

To be eligible to bid on the P3 NJSA Project, GDC required interested bidders to prequalify, announcing its Request for Qualifications ("RFQ") on November 7, 2024. (Compl. ¶ 50.) On February 26, 2025, GDC prequalified Plaintiff George Harms Construction Co., Inc. ("Harms"), along with three other teams. (*Id.* ¶ 52.) Harms incurred expenses in the prequalification process as the process entailed demonstrating its technical qualifications, financial capacity, and the availability of its workforce. (*Id.* ¶¶ 51, 54.) Harms's workforce consists solely of employees represented by the United Steel, Paper and Forestry, Rubber Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO ("USW" or "United Steel") pursuant to a collective bargaining agreement ("CBA") existing between it and USW. (*Id.* ¶¶ 51, 99.) The three other prequalified teams, however, have workforces represented only by the Hudson County Building and Construction Trades Council, AFL-CIO ("the Building Trades union"). (*Id.* ¶ 53.)

Plaintiffs challenge Defendants' course of action following the pre-qualification process.[2] On February 28, 2025, two days after announcing the pre-qualified teams, GDC released the Request for Proposals ("RFPs"). (Compl. ¶ 76.) According to Harms, neither the draft nor the Final RFPs definitively established that GDC would be using a PLA. (*Id.* ¶¶ 77, 90.) However, after being notified of GDC's intention to use a PLA in an April 14, 2025 one-on-one meeting, Harms "immediately" voiced its opposition. (*Id.* ¶ 78.) In the months that followed, the USW communicated its objection to the use of a PLA on the P3 NJSA Project various times. (Compl. ¶¶ 79 (July 14, 2025), 83, 84, 87 (August 8, 2025), 88, 92 (August 20, 2025).) This was not the first time Harms opposed the GDC's use of a PLA; it previously objected to the use of a PLA in another HTP contract for the P1A Palisades Tunnel Project ("the Palisades Project"). (*Id.* ¶¶ 59–63; Rinaldi Decl. ¶ 4(b).)

Plaintiffs take issue with the adopted PLA for a host of reasons. They claim the PLA was negotiated without considering Harms and its objections, notwithstanding GDC's prior knowledge of Harms's opposition to the use of PLAs as evinced in the Palisades Project. (Compl. ¶¶ 72–73, 94, 109.) Harms also asserts that it cannot bid on the P3 NJSA Project, because there are conflicting terms between the PLA and the CBA it has with USW, such that it cannot attest to the

---

[1] In support of their request for a TRO, Plaintiffs claim "the Project is in limbo" given that "President Trump has publicly declared that the HTP has been 'terminated.'" (D.E. 3-3 at 64.) However, at the December 3, 2025 hearing defense counsel represented that the Project is not suspended, noting that "[t]here are boots on the ground and shovels in the dirt." (D.E. 43 ("Tr.") 20:18–21:6.)

[2] Plaintiff Brian Burns is a member of the union Harms is affiliated with, USW Local 318, and works on Harms's projects. (Compl. ¶ 2; D.E. 31-1, Silber Decl. ¶ 30.)

PLA's Letter of Assent.[3] (*Id.* ¶¶ 99, 103.) Harms also takes issue with having to recognize the Building Trades union as the "sole and exclusive" bargaining representative and making fringe benefits payments Building Trades.[4] (*Id.* ¶¶ 98, 100.) According to Harms, it has been denied the opportunity to submit a bid on December 10, 2025 and lost the $1.2 million opportunity for a lost bid. (*Id.* ¶¶ 103, 105, 108.) In response, Defendants have continuously informed Harms the PLA does not impede it from submitting its bid and that it is free to do so. (*Id.* ¶ 101.)

On October 8, 2025, pursuant to the GDC's Protest Procedures, Harms filed a formal protest. (*Id.* ¶ 114.) On October 14, 2025, the GDC appointed Amy Hull as Protest Officer. (Compl. ¶ 115; D.E. 1-7, Ex. 5.) On November 21, 2025, Protest Officer Hull issued her Final Decision denying Harms's protest, (D.E. 20, Ex. H to Djuretic Decl. at 72), which Harms has appealed, (D.E. 31-1 at 10).[5]

### B. Procedural History

While Plaintiffs awaited Protest Officer Hull's decision, they initiated the instant lawsuit on November 18, 2025, filing an unverified Complaint, (D.E. 1), and a Motion seeking a Temporary Restraining Order, (D.E. 3), against Defendants GDC, its Commissioners,[6] the Federal Transit Administration ("FTA"), and the United States Department of Transportation ("USDOT"). In their Motion, Plaintiffs request that this Court issue a TRO staying the December 10, 2025 bidding deadline until it can obtain an adjudication on its bid protest. (D.E. 3-3 ("Mov. Br.") at 17.) Plaintiffs' Complaint asserts violations of: the GDC Act, N.J. Stat. Ann. §§ 32:36-1 *et seq.* (Count I); their First Amendment, procedural due process, and equal protection rights pursuant to 42 U.S.C. § 1983 (Counts II through IV); rights under the Constitution and laws of New Jersey (Count V); and the Sherman Act, 15 U.S.C. §§ 1 *et seq.* (Count VI). (Compl. at 26–35.) Count VII seeks a declaratory judgment that the PLA violates all the aforementioned rights or laws. (*Id.* at 35–37.)

On November 19, 2025, this Court issued an Order to Show Cause ("OTSC") and set a hearing date and briefing schedule. (D.E. 5.) On December 3, 2025, the undersigned held a hearing on the Motion and reserved decision, taking the matter under advisement. (D.E. 39.) All

---

[3] In the Letter of Assent, the signatory agrees to "be bound by the terms and conditions of the [PLA]" and binds itself and all its employees; "[c]ertifies that it has no commitments or agreements that would preclude its full compliance with the terms and conditions of said [PLA]"; and "[a]grees to secure from any Contractor(s) (as defined in said [PLA]) which is or becomes a Subcontractor(s) (of any tier), a duly executed Letter of Assent . . . prior to commencement of any work." (D.E. 1-4 at 81.)

[4] Although Harms and USW have a 1994 Harmony Agreement to ensure labor harmony and handle jurisdiction issues, there are "longstanding tensions and direct competition between the USW and [Building Trades] unions." (D.E. 1-6, Ex. 4, Silber Cert. ¶ 25.)

[5] In their Opposition Brief, Defendants extensively rely on the Protest Officer's findings and conclusions. Given that there is a mechanism to appeal the Protest Officer's decision, this Court finds such reliance is misplaced and declines to review the Protest Officer's decision.

[6] Defendant Commissioners are: Dr. Grewal-Virk, Alicia Glen, Tony Coscia, Jamey Barbas, Amy Rosen, Marie Therese Dominguez, Victor Herlinksky, Jr., and Thomas Prendergast. (Compl. ¶¶ 4–11.)

parties were present at the hearing.[7] Notably, at the hearing Plaintiffs' counsel agreed that in light of the Protest Officer's November 21, 2025 decision, Plaintiffs' challenge was now focused "on the PLA and the December 10th bid deadline." (Tr. 11:21–12:6.)

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 65 governs TROs and preliminary injunctions. Generally, a TRO temporarily preserves the status quo, *Hope v. Warden York County Prison*, 956 F.3d 156, 160 (3d Cir. 2020), while a preliminary injunction "grants 'intermediate relief of the same character as that which may be granted finally,'" *Brown v. Tolerico*, No. 16-9413, 2017 WL 838802, at *2 (D.N.J. Mar. 3, 2017) (quoting *De Beers Consolidated Mines v. United States*, 325 U.S. 212, 220 (1945)). "The standard used to evaluate whether the issuance of a temporary restraining order is warranted is the same as that used to evaluate whether the issuance of a preliminary injunction is appropriate." *Int'l Foodsource, LLC v. Grower Direct Nut Co.*, No. 16-3140, 2016 WL 4150748, at *6 (D.N.J. Aug. 3, 2016).

A party seeking a preliminary injunction must first establish (1) a likelihood of success on the merits and (2) that "it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Mallet & Co. v. Lacayo*, 16 F.4th 364, 380 (3d Cir. 2021) (quoting *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017)). Only if the movant establishes these two factors does a court consider (3) whether granting preliminary injunctive relief will harm the nonmoving party or other interested persons and (4) the public interest. *Reilly*, 858 F.3d at 178–79. Lastly, the court "determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179. "An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010).

## III. DISCUSSION

### A. Standing

Under Article III of the United States Constitution, "a case or controversy can exist only if a plaintiff has standing to sue." *United States v. Texas*, 599 U.S. 670, 675 (2023). A court assesses standing at a case's inception to determine whether at least one plaintiff has standing. *Road-Con, Inc. v. City of Phila.*, 120 F.4th 246, 354 (3d Cir. 2024). "If at least one plaintiff has standing, the suit may proceed." *Biden v. Nebraska*, 600 U.S. 477, 489 (2023). To have standing to sue, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "At the pleading stage, general factual allegation of injury resulting from the defendant's conduct may suffice." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

---

[7] In anticipation of this Court's December 3, 2025 hearing, counsel for Defendants the FTA and USDOT ("the Federal Defendants"), Assistant United States Attorney John F. Basiak, Jr., filed a letter indicating "the Federal Defendants take no position on Plaintiffs' request for temporary restraints" and did not anticipate responding to the November 19, 2025 OTSC. (D.E. 25.) Mr. Basiak reiterated the same position at the December 3, 2025 hearing. (Tr. 6:12–19.)

5

An "injury in fact" is the "invasion of a legally protected interest" which is particularized—meaning it affects the plaintiff in a personal and meaningful way—and concrete—whether actual or imminent. *Spokeo*, 578 U.S. at 339–40; *Lujan*, 504 U.S. at 560–61; *cf. Yaw v. Delaware River Basin Comm'n*, 49 F.4th 302, 318 (3d Cir. 2022) ("[W]hen a plaintiff seeks *prospective* (forward-looking) relief in the form of an injunction or a declaratory judgment, they must show that they are 'likely to suffer *future* injury.'" (quoting *McNair v. Synapse Grp., Inc.*, 672 F.2d 213, 223 (3d Cir. 2012)).

*Road-Con, Inc. v. City of Philadelphia*, 120 F.4th 346 (3d Cir. 2024) instructs this Court's standing analysis. In *Road-Con*, the Third Circuit held that the contractor plaintiffs' complaint—which asserted that plaintiffs were interested in bidding but were ineligible due to conflicting terms between a CBA they were a party to and Philadelphia's adoption of a PLA—satisfied the injury in fact requirement. 120 F.4th at 354. The court reasoned that the plaintiffs' allegations that the use of a PLA infringed on their First Amendment rights by forcing them to recognize a union as their employees' exclusive representative were sufficient. *Id.* at 354–55. The Third Circuit held the alleged injury was particularized and concrete because the plaintiffs alleged an injury to themselves and asserted "a 'harm to their legally protected First Amendment interest.'" *Id.* at 355 (quoting *Associated Builders & Contractors W. Pa. v. Community College of Alleghany*, 81 F.4th 279, 289 (3d Cir. 2023)). Lastly, the court held the plaintiffs' future injuries, namely "their ineligibility to work on PLA-covered projects without changing unions," were imminent where the contractor plaintiffs expressed they were interested in bidding on Philadelphia's projects. *Id.* at 355–56.

Similarly here, the heart of Plaintiffs' case is that notwithstanding Harms's opposition to the use of a PLA on the P3 NJSA Project, the GDC's Commissioners approved the PLA which will in turn have an exclusionary effect on Harms in violation of rights sounding in both federal and state law rights. Plaintiffs' Complaint alleges they are incapable of bidding on the P3 NJSA Project due to conflicting terms between the PLA and the CBA Harms has with USW—which is sufficient to satisfy the injury in fact requirement. Plaintiffs assert these injuries on behalf of themselves, such that there is no particularity issue. *See Associated Builders*, 81 F.4th at 288. Furthermore, Plaintiffs have indicated their desire to bid on the Project, particularly because they already incurred expenses to get prequalified to do so. Plaintiffs have standing to sue.

### B. Preliminary Injunction[8]

In considering the elements necessary for the issuance of a preliminary injunction—a "drastic and extraordinary remedy[] which should not be granted as a matter of course"—this Court concludes Plaintiffs have not met their burden of demonstrating a likelihood of success on the merits or irreparable harm. *See Monsanto*, 561 U.S. at 165.

#### 1. *Likelihood of Success on the Merits*

---

[8] Plaintiffs initially moved before this Court for a TRO but consent to the adjudication of their claim for declaratory judgment seeking a preliminary injunction. (Tr. 13:1–3 ("I would respectfully submit that the case could be decided as a declaratory judgment based upon the record before Your Honor.").) Accordingly, this Court analyzes whether Plaintiffs have met their burden to merit the issuance of a preliminary injunction.

To establish a likelihood of success, a plaintiff must demonstrate "that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not)." *Reilly*, 858 F.3d at 179.

In support of their argument that they have shown a likelihood of success on the merits, Plaintiffs adopt a kitchen-sink approach and anchor most of their claims in the argument that Defendants' use of a PLA for the P3 NJSA Project is exclusionary and thus works a violation of both federal and state rights. (D.E. 3-3 at 33–38 (violation of GDC's enabling act and New Jersey's public bidding laws and Project Labor Agreements ("PLA") Act), 39–40 (Procurement Guidelines), 44–45 (New Jersey Constitution), 46–48 (federal funding conditions), 56–58 (Sherman Act).) Harms contends the PLA is exclusionary because the bidding process requires acceding to the Letters of Assent which would in turn lead Harms to renege on its CBA obligations owed to USW. (D.E. 3-3 at 31.) However, both in its briefing and at the December 3, 2025 hearing, Plaintiffs failed to satisfactorily explain why a separate contract and relationship they have with USW that precedes the Project should be a basis for Defendants' liability. Further, the record evinces the fact that Plaintiffs have made little no attempt to discuss their participation in the Project with the Building Trades union, notwithstanding GDC's offer to engage in such discussions. (D.E. 18-3, Kelleher Decl. ¶ 13 ("[T]he USWA has made no such contact or inquiry with the HCBCTC regarding participating in the surface alignment project. Had the USWA done so, consistent with the Harmony Agreement, the HCBCTC would have discussed with the USWA the terms and conditions of the USWA's participation in the surface alignment project."); Tr. 35:21–36:1 ("The [GDC] has been clear that they are open to those discussions. And we are hopeful that something could be worked out so that their interest could be justified.").)

Plaintiffs rely on the Supreme Court of New Jersey's decision in *George Harms Construction Co. v. New Jersey Turnpike Authority*, 644 A.2d 76 (N.J. 1994), yet curiously omit any mention of the same court's decision in *Delaware River Joint Toll Bridge Commission v. George Harms Construction Co.*, 318 A.3d 643 (N.J. 2024). In its 1994 decision, the New Jersey Supreme Court found that the New Jersey Turnpike Authority's ("TPA") adoption of a resolution requiring it to "award [a] contract to the lowest-responsible bidder that had entered into a project-labor agreement with Building and Construction Trades Council (BCTC) unions" exceeded New Jersey's public bidding laws *as they were at the time*. 644 A.2d 79–80, 94–95. More specifically, the court reasoned that it did not understand New Jersey's public bidding laws "to confer on a public entity the authority to specify a sole source of construction services or to denote a specific union affiliation as a characteristic of the lowest-responsible bidder or as a bid specification." *Id.* at 94. Yet that is what the PLA Act now permits. The PLA Act permits a public entity to include a PLA "in a public works project on a project-by-project basis" and to "directly negotiate in good faith a [PLA] with one or more labor organizations" or "condition the award of a contract to a construction manager upon a requirement that the construction manager negotiate" a PLA in good faith with one or more labor organizations. N.J. Stat. Ann. § 52:38-3.

In fact, the New Jersey Supreme Court upheld the Delaware River Joint Toll Bridge Commission's ("the DRJTB Commission") exercise of power to enter a PLA in the DRJTB Commission's Scudder Falls Bridge Project when Harms brought a similar challenge asserting use of the PLA violated its state and federal rights. 318 A.3d at 649. The court reasoned that the plain language of the compact creating the DRJTB Commission "encompass[ed] the power to require

7

that a party with whom the Commission contracts to build a bridge across the Delaware River sign a PLA." *Id.* at 655. The compact maintained that the DRJTB could enter into contracts, determine "all other matters in connection with[] any and all improvements or facilities which it may be authorized to own [or] construct," and exercise "all other powers . . . reasonably necessary" to effectuate the DRJTB Commission's purpose. *Id.* at 647 (quoting N.J. Stat. Ann. §§ 32:8-3(b), (h), (p)).

Here, Plaintiffs have not met their burden of establishing that the GDC's adoption of the PLA goes beyond what the enabling act permits and amounts to a violation of Plaintiffs' rights. The GDC Act's provisions are very similar to those in *Delaware River*. The GDC has the power to sue and be sued, acquire property, and enter into and execute contracts. N.J. Stat. Ann. §§ 32:6-8(b),(e). The Commission is also enabled to "[e]xercise all other powers as may be necessary or appropriate in furtherance of, and consistent with, the purposes" of the GDC Act. N.J. Stat. Ann. § 32:36-8(r). This grant of power, coupled with the PLA Act's grant of authority for a public entity to enter into a PLA, confirms that the GDC has the authority to enter into a PLA so long as it complies with the aforementioned laws.[9]

The PLA's terms are not exclusionary and GDC has not acted in an exclusionary manner to Plaintiffs' detriment by adopting it. According to Section 8 of Article 2 of the PLA, the local unions represented by Building Trades union agree that the PLA will "fully apply to any successful bidder for Project work who becomes a signatory thereto, without regard to whether that successful

---

[9] Plaintiffs contend that GDC's failure to conduct an independent analysis to determine whether the use of the PLA in the Project complies with the PLA Act, reliance on a prior project's study, and failure to publish the results of the feasibility study conducted either violate the PLA Act or their procedural due process rights. (D.E. 3-3 at 38, 51–53.) Notably, Plaintiffs have not put forth any factual support for their claim that the feasibility study results from a prior project were utilized by GDC. They also fail to identify what protected liberty or property interest they were deprived of in light of relevant Third Circuit precedent, instead relying on a 2012 case from the United States District Court for the District of Columbia to identify the right of freedom from *de facto* debarment as the relevant protected interest.

Even considering Plaintiffs' novel argument, Plaintiffs do not establish *de facto* debarment occurred. To demonstrate *de facto* debarment, a plaintiff must show an agency's systemic effort "to reject all of the bidder's contract bids" evinced either by an agency's statement or conduct demonstrating that it will not award the contractor future contracts. *Phillips v. Mabus*, 894 F. Supp. 2d 71, 81 (D.D.C. 2012). Here, GDC has repeatedly indicated Harms is capable of bidding and as discussed *infra*, has been responsive to Plaintiffs' questions and concerns.

Lastly, in her Declaration to this Court, GDC's Executive Vice President Catherine Rinaldi explained that the feasibility study's results have not been published "[b]ecause the study relies upon non-public information (including budget and cost assumptions, trade allocations, and related projections that are not disclosed to bidders during the procurement process)." (Rinaldi Decl. ¶ 20.) Plaintiffs' counsel, Noel Hillman, Esq., similarly represented to this Court that the study "reveals how an agency evaluated different bids in a proprietary way," and is subject to "an agency deliberative process privilege[] as well as an attorney-client privilege," such that disclosure could be harmful to the bidding process. (Tr. 33:3–14.) Defense counsel also indicated it would be willing to have this Court conduct an *in camera* review of the feasibility study, if necessary. (Tr. 33:15–17.) Given Plaintiffs' failure to articulate a viable theory as to how its procedural rights have been violated, this Court concludes an *in camera* review is presently uncalled for but does not foreclose the possibility of inspection at a later time.

bidder performs work at other sites on either a union or non-union basis and *without regard to whether employees of such successful bidder are, or are not, members of any unions*." (D.E. 1-4 at 44 (emphasis added).)  The plain language reading of this provision indicates that Building Trade unions will work with the successful bidder regardless of the successful bidder's union membership or lack thereof and thus negates Harms's contention that its affiliation with USW serves as a basis for its exclusion.  Additionally, the record demonstrates GDC has been responsive to Harms's RFIs, has issued a response to Plaintiffs' Protest, and is willing to jointly negotiate with USW—an opportunity Harms has not availed itself of.  Thus, for those counts where Plaintiffs rely on their exclusionary theory to argue Defendants have violated their rights, this Court finds Plaintiffs have not shown a likelihood of success on the merits.

This Court now turns to Plaintiffs' First Amendment claim.  Plaintiffs point to Section 1 of Article 4 in the PLA to support their argument that the PLA violates their First Amendment right not to associate.[10]  (D.E. 3-3 at 27, 29–30.)  They also argue that the PLA would unlawfully compel speech in the form of fringe benefits payments.  (D.E. 3-3 at 27–30.)

The First Amendment forbids the abridgement of the freedom of speech and protects the right to associate, as well as the right not to engage in speech or a particular association.  *Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 585 U.S. 878, 891–92 (2018).  In *Janus*, the Supreme Court considered a First Amendment challenge to an Illinois law regulating state employees' rights to unionize.  *Id.* at 886.  Under the terms of the Illinois law, the union selected by a majority of employees would be deemed the "sole permitted representative" of both union and non-union workers and would provide fair representation for all employees.  *Id.* at 886–87. The Court did not find this aspect of the law to be constitutionally infirm.  Instead, the Court recognized a State's power to "require that a union serve as [an] exclusive bargaining agent for its employees—itself a significant impingement on associational freedoms that would not be tolerated in other contexts."  *Id.* at 916; *see Oliver v. Serv. Emps. Int'l Union Loc.*, 830 Fed. App'x 76, 80 n.4 (3d Cir. Oct. 7, 2020) ("All Circuits that have addressed this issue subsequent to the *Janus* decision have concluded that exclusive representation remains constitutional.").

Notwithstanding, the Court struck down the Illinois law based on its agency fee provision. Under the law's terms, non-union members were automatically assessed an "agency fee," which amounted to a percentage of the union's dues.  *Janus*, 585 U.S. at 887.  The Court held that states and public-sector unions could not extract agency fees or any other payment "unless the employee affirmatively consents to pay."  *Id.* at 929–30.  In applying "exacting" scrutiny, the Court determined that neither labor peace nor avoiding free riders were compelling state interests.  *Id.* at 895–97, 901.

Applying *Janus* to the facts of the case at bar, this Court finds Plaintiffs have demonstrated a likelihood of success on the merits of their First Amendment compelled speech claim.  The PLA requires "Contractors . . . to pay contributions on behalf of all employees covered by [the PLA] to the established employee benefit funds." (D.E. 1-4 at 63.)  For Plaintiffs to bid on the Project would effectively mean being compelled to pay into employee benefit funds notwithstanding their

---

[10] Article 4, Section 1 provides: "The Contractors recognize the signatory Unions as the sole and exclusive bargaining representatives of all craft employees who are performing on-site Project work within the scope of this Agreement as defined in Article 3." (D.E. 1-4 at 46.)

9

reservations to do so. *See Janus*, 585 U.S. at 929; (D.E. 1-2, Burns Cert. ¶ 7 (objecting to "forced contribution of dues")). However, the PLA's inclusion of Article 4, Section 1 does not constitute a violation of Plaintiffs' right not to associate. *See Janus*, 585 U.S. at 916.

To summarize, based on the record before it, this Court concludes Plaintiffs have only demonstrated a likelihood of success on the merits as to their compelled speech claim brought under the First Amendment.

### 2. *Irreparable Harm*

A plaintiff seeking an injunction has "the burden of proving a 'clear showing of immediate irreparable injury.'" *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) (quoting *Continental Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980)); *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction.") (emphasis in original). "The 'requisite feared injury or harm must be irreparable—not merely serious or substantial,' and it 'must be of a peculiar nature, so that compensation in money cannot atone for it.'" *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91–92 (3d Cir. 1992) (quoting *ECRI*, 809 F.2d at 226).

Plaintiffs have not made a clear showing of immediate irreparable injury. Plaintiffs contend that "[t]he GDC's decision to plow ahead with an unlawful PLA will preclude Harms from bidding on the Project and deprive workers like Burns the opportunity to work unless they associate with a different union." (D.E. 3-3 at 22.) As discussed *supra*, however, Plaintiffs have not demonstrated that the PLA is exclusionary and prevents them from bidding on the P3 NJSA Project. Should Harms proceed to bid, but not be awarded the Project, it can recover $1.2 million. (Compl. ¶ 105.) And should Harms proceed not to bid, Plaintiffs have a colorable claim to recover on the expenses incurred in obtaining prequalification status and for lost opportunity costs.[11] *See Otsuka Pharm. Co., Ltd. v. Torrent Pharm. Ltd., Inc.*, 99 F. Supp. 3d 461, 501 (D.N.J. 2015) (collecting cases lending support for the proposition that numerous courts have rejected assertions of "loss of market share, lost sales, price erosion, and even employee layoffs" as irreparable harm because such harms are "reducible to a dollar value"); *Bellator Sport Worldwide, LLC v. Alvarez*, No. 13-63, 2013 WL 12141415, at *2 (D.N.J. Jan. 25, 2013) (rejecting the plaintiff's assertion that his inability to compete in an event on a particular date would amount to irreparable harm "in the form of a lost opportunity to obtain notoriety, endorsement, and a wider exposure to viewers" where the argument "require[d] th[e] [c]ourt to make speculative assumptions about what might or might not happen" as a result of participation, or a lack thereof, in the event). Harms's assertions that the Project is a "once-in-a-generation project" and that failure to be awarded it will result in a lost opportunity and reputational harm not only ask this Court to engage in suppositions and inferences but also claim injuries that can be quantified. *See Otsuka*, 99 F. Supp. 3d at 501; *Bellator*, 2013 WL 12141415, at *2.

To the extent that this Court found Plaintiffs demonstrated a likelihood of success on their violation of free speech claim, Plaintiffs have not established they will be irreparably harmed if an

---

[11] The status of Harms's decision to bid is unclear.

injunction is not issued.  Although the Third Circuit "presume[s] that First Amendment harms are irreparable," this presumption is the exception to its general rule refusing to presume that a constitutional harm is "necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction*." Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 203–04 (3d Cir. 2024) (quoting *Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989)).  The exception to the general presumption is motivated by a fear that a prior restraint will suppress communication "before an adequate determination that it is unprotected by the First Amendment" is made and because First Amendment activity "can be especially time-sensitive." *Id.* at 204 (quoting *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 390 (1973)).  Even so, a plaintiff alleging a First Amendment violation on speech "must show 'a chilling effect on free expression.'" *Hohe*, 868 F.2d at 73 (quoting *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965)).  Plaintiffs have not demonstrated such a chilling effect.  *See Hohe*, 868 F.2d at 73 (rejecting the plaintiffs' argument that the "deduction and collection of fair share fees from nonmembers' paychecks" constituted irreparable harm where non-members could potentially "be deprived of money they might use to support their own political, ideological, or other purposes").  Indeed, the record before this Court shows Plaintiffs have not been deterred from pursuing contracts on government projects notwithstanding the inclusion of similar PLAs in other projects.

Given that Plaintiffs have not met their burden of showing a likelihood of success on the merits or irreparable harm, this Court declines to address the remaining factors under the preliminary injunction inquiry.  *See Reilly*, 858 F.3d at 178–79.

### IV.    CONCLUSION

For the foregoing reasons, this Court **DENIES** Plaintiffs' Motion.  An appropriate order follows.

                                                             /s/ Susan D. Wigenton
                                             **SUSAN D. WIGENTON, U.S.D.J.**

Orig:   Clerk
cc:     Parties
         Jose R. Almonte, U.S.M.J.